Filed 4/4/16

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ROSEMARY MORGAN et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>BEAUMONT POLICE DEPARTMENT et al.,<br><br>    Defendants and Respondents. | D069308<br><br><br>(Super. Ct. No. RIC1118540) |

APPEAL from a judgment of the Superior Court of Riverside County, Gloria Trask, Judge.  Reversed.

The Stone Law Group, Rebecca L. Reed, Kenneth H. Stone; Higgs, Fletcher & Mack and Christina M. Denning for Plaintiffs and Appellants.

Smith Law Offices, Douglas C. Smith and Blakney A. Boggs for Defendants and Respondents.

Plaintiffs and appellants Rosemary Morgan and Michelle Luna (collectively plaintiffs) are the widow and daughter, respectively, of decedent Mike Wayne Morgan.

Morgan suffered fatal injuries when defendant Thomas Durnin crashed head-on into Morgan's vehicle as Durnin was fleeing from Beaumont Police Officer Brian Stehli during a vehicle pursuit that lasted nearly 12 minutes. As relevant to this appeal, plaintiffs' operative complaint alleged a wrongful death cause of action against defendants City of Beaumont (City) and the Beaumont Police Department (BPD) (sometimes collectively defendants).

The trial court granted defendants' motion for summary judgment, concluding they were immune from liability pursuant to Vehicle Code[1] section 17004.7. This statute immunizes public entities from liability for injuries resulting from police pursuits of suspected criminals. In granting the motion, the court found that defendant BPD had a "policy and procedure in place" and, therefore, that section 17004.7 applied.

On appeal, plaintiffs contend the court erred in granting summary judgment because defendants failed to show by sufficient evidence that BPD as a matter of law promulgated a vehicle pursuit policy and provided the requisite training as required under section 17004.7. As we explain, we agree with plaintiffs that defendants failed to proffer sufficient evidence to establish as a matter of law that BPD promulgated its vehicle pursuit policy as required under section 17004.7. We therefore reverse the trial court's decision.

---

1       All further statutory references are to the Vehicle Code unless otherwise noted.

FACTUAL AND PROCEDURAL BACKGROUND

A little before noon on March 17, 2011, Officer Stehli was monitoring traffic on a City street when he saw a silver pickup truck drive by with a large crack in its front windshield and a broken tail light. Officer Stehli pulled behind the pickup. After calling in the pickup's license plate number to dispatch, Officer Stehli activated the lights, and used the air horn once, on his police cruiser as he followed behind the pickup. Instead of stopping, however, the driver of the pickup, later identified as Durnin, accelerated.[2]

In addition to lights and a siren, Officer Stehli's cruiser was equipped with a recording system that recorded data and captured video from a camera mounted on the cruiser's dashboard. On the day in question, the camera was operational.[3]

As the pickup came to an intersection, its driver did not stop at a stop sign. Officer Stehli in response activated his cruiser's siren. About five minutes into the pursuit, Officer Stehli lost radio communication with dispatch. However, except for about 30 seconds, Officer Stehli remained in communication with dispatch for the duration of the pursuit by using the "speaker phone" on his cell phone.

---

[2] Durnin was subsequently convicted of second degree murder (Pen. Code, § 187, subd. (a)) and of evading a peace officer and causing the death of another (Veh. Code, § 2800.3), among other offenses arising from this incident. This court affirmed his judgment of conviction. (See *People v. Durnin* (Apr. 9, 2015, D066961) [nonpub. opn.].)

[3] The video recording of the pursuit was attached as an exhibit to defendants' motion for summary judgment or, in the alterative, summary adjudication (motion). The video was left out of the appellate record but was subsequently added to the record based on defendants' motion to augment.

With Officer Stehli in pursuit, the pickup failed to stop at another intersection, then sped up and continued south on California Avenue towards Highway 79. Just before the California Avenue/Highway 79 intersection, the pickup went around a slow-moving vehicle, in the southbound lane of California, then merged onto Highway 79 from a dirt area. During the pursuit, Officer Stehli and/or the suspect driver were traveling at speeds of up to about 90 miles per hour. As the pursuit continued, the Riverside County Sherriff's Department and the California Highway Patrol were contacted.

After traveling about two miles south on Highway 79, the pickup approached the intersection of Landfill Road/Highway 79. Although the traffic light was red, the pickup failed to stop at the intersection and instead continued south on Highway 79. The pickup next continued south on Highway 79 for about three more miles, then exited onto Gilman Springs Road. When exiting Highway 79, the pickup passed two vehicles on the right shoulder, went through a stop sign at the bottom of the exit ramp, and turned left from a right-hand lane. It was at that point in the pursuit that Officer Stehli lost radio contact and relied on his cell phone to communicate with dispatch.

After traveling about two and half miles on Gilman Springs Road, the pickup turned onto Soboba Road. As Officer Stehli pursued the pickup on Soboba Road, he made a "brief visual" of the pickup as it traveled about a half-mile ahead of him. As the pursuit continued on Soboba Road, Officer Stehli saw the pickup pass through the Lake Park Drive intersection without stopping. Almost immediately thereafter, Officer Stehli lost sight of the pickup as it went up and then down a crest on Soboba Road.

4

The record is less than clear regarding whether Officer Stehli terminated the pursuit mere seconds before or after the collision, or at the same time he saw a "cloud of dirt" that he immediately recognized was the result of a collision. As discussed *post*, plaintiffs contend the evidence shows Officer Stehli terminated the pursuit *after* or, at a minimum, at the *same time* he saw the "cloud of dirt" arising from the collision.

Defendants, however, contend Officer Stehli terminated the pursuit before the collision. They rely on the testimony of Officer Stehli, who declared that after the pickup went up and over the "crest" on Soboba Road, he then decided to terminate the pursuit; that he went from "Code 3 (all lights/siren) to Code 2 (red light only)"; that as he continued driving on Soboba Road, he saw the "cloud of dirt[] and realized that the [pickup] truck had collided with another vehicle, later determined to be driven by Mr. Morgan"; and that he turned off his cruiser's siren—but as noted, not its lights—at 11:19:54. Officer Stehli further declared that, as he continued to drive on Soboba Road, he came upon the collision, which had caused the "cloud of dirt," at 11:20:10, or 16 seconds after he had turned off his cruiser's siren.

In any event, the record shows the pickup driven by Durnin crossed a double yellow line and struck Morgan's vehicle traveling in the opposite direction. As noted, Morgan subsequently died from his injuries resulting from the collision.

Defendants sought summary judgment/adjudication on several grounds, including that neither they nor Officer Stehli were negligent. However, defendants argued the trial court was not required to reach the negligence issue because they were immune under

5

section 17004.7.  As noted, the court concluded defendants were immune from liability under section 17004.7 and granted summary judgment for defendants.

DISCUSSION

I

Immunity

A.  *Standard of Review*

A trial court must grant a summary judgment motion when the evidence shows that there is no triable issue of material fact and that the moving party is entitled to judgment as a matter of law.  (Code Civ. Proc., § 437c, subd. (c); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).)  We apply a de novo standard in reviewing a grant of summary judgment and independently decide whether the facts not subject to triable dispute as a matter of law warrant judgment for the moving party.  (*Aguilar*, at p. 860.)  In making this determination, the court must view the evidence, including all reasonable inferences supported by that evidence, in the light most favorable to the nonmoving party.  (*Ennabe v. Manosa* (2014) 58 Cal.4th 697, 703; *Aguilar*, at p. 843.)

A defendant moving for summary judgment, such as in the instant case, has the burden of producing evidence showing that one or more elements of the plaintiff's cause of action cannot be established or, such as in the instant case, that there is a complete defense to that cause of action.  (Code Civ. Proc., § 437c, subd. (o)(2); *Aguilar*, *supra*, 25 Cal.4th at pp. 850-851, 854-855.)  Once this burden is met, the burden next shifts to the

6

plaintiff to produce specific facts showing a triable issue as to the cause of action or the defense. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, at pp. 850-851.)

In reviewing the propriety of an order granting summary judgment, we "apply the same three-step analysis required of the trial court. We begin by identifying the issues framed by the pleadings since it is these allegations to which the motion must respond. We then determine whether the moving party's showing has established facts which justify a judgment in movant's favor. When a summary judgment motion prima facie justifies a judgment, the final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue." (*Hernandez v. Modesto Portuguese Pentecost Assn.* (1995) 40 Cal.App.4th 1274, 1279.) *If* there is no triable issue of material fact, "we affirm the summary judgment if it is correct on any legal ground applicable to this case, whether that ground was the legal theory adopted by the trial court or not, and whether it was raised by defendant in the trial court or first addressed on appeal." (*Jordan v. Allstate Ins. Co* . (2007) 148 Cal.App.4th 1062, 1071 (*Jordan*); see *Western Mutual Ins. Co. v. Yamamoto* (1994) 29 Cal.App.4th 1474, 1481 [noting "where there is no genuine issue of material fact, the appellate court should affirm the judgment of the trial court if it is correct on any theory of law applicable to the case, including but not limited to the theory adopted by the trial court"].)

B. *Section 17004.7*

Our analysis of section 17004.7 is guided by settled principles of statutory interpretation. Our " ' "fundamental task is 'to ascertain the intent of the lawmakers so as

7

to effectuate the purpose of the statute.' " '  [Citation.]  As always, we start with the language of the statute, 'giv[ing] the words their usual and ordinary meaning [citation], while construing them in light of the statute as a whole and the statute's purpose [citation].' "  (*Apple Inc. v. Superior Court* (2013) 56 Cal.4th 128, 135.)

" 'The statute's words generally provide the most reliable indicator of legislative intent; if they are clear and unambiguous, "[t]here is no need for judicial construction and a court may not indulge in it."  [Citation.]  Accordingly, "[i]f there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs."  [Citation.]' "  (*Cequel III Communications I, LLC v. Local Agency Formation Com. of Nevada County* (2007) 149 Cal.App.4th 310, 318.)

"Nonetheless, 'the "plain meaning" rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute.  The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible.  [Citation.]' (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.)  If a statute is susceptible to more than one reasonable interpretation, the court may consider the statute's purpose, the evils to be remedied, the legislative history, public policy, and contemporaneous administrative construction.  (*Nolan v. City of Anaheim* (2004) 33 Cal.4th 335, 340.)  In addition, the court may consider the consequences that will flow from a particular interpretation.  (*Dyna–Med, Inc. v. Fair Employment &*

8

*Housing Com.* (1987) 43 Cal.3d 1379, 1387.)"  (*California Ins. Guarantee Assn. v. Workers' Comp. Appeals Bd.* (2012) 203 Cal.App.4th 1328, 1338; see *Yohner v. California Dept. of Justice* (2015) 237 Cal.App.4th 1, 8 (*Yohner*) [noting in interpreting a statute a court " ' " 'must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences' " ' "].)

Under California law, a public entity generally is liable "for death or injury to person or property proximately caused by a negligent or wrongful act or omission in the operation of any motor vehicle by an employee of the public entity acting within the scope of his employment."  (§ 17001.)  As relevant here, an exception to a public entity's liability is set forth in section 17004.7, subdivision (b)(1), which provides: "A public agency employing peace officers that adopts and promulgates a written policy on, and provides regular and periodic training on an annual basis for, vehicular pursuits complying with subdivisions (c) and (d) is immune from liability for civil damages for personal injury to or death of any person or damage to property resulting from the collision of a vehicle being operated by an actual or suspected violator of the law who is being, has been, or believes he or she is being or has been, pursued in a motor vehicle by a peace officer employed by the public entity."

On appeal, plaintiffs do not dispute that BPD's vehicular pursuit policy complies with the minimum standards set forth in subdivision (c) of section 17004.7.[4] Instead,

4      Subdivision (c) of section 17004.7 provides: "A policy for the safe conduct of motor vehicle pursuits by peace officers shall meet all of the following minimum standards: [¶] (1) Determine under what circumstances to initiate a pursuit. The policy shall define a ' "pursuit," ' articulate the reasons for which a pursuit is authorized, and identify the issues that should be considered in reaching the decision to pursue. It should also address the importance of protecting the public and balancing the known or reasonably suspected offense, and the apparent need for immediate capture against the risks to peace officers, innocent motorists, and others to protect the public. [¶] (2) Determine the total number of law enforcement vehicles authorized to participate in a pursuit. Establish the authorized number of law enforcement units and supervisors who may be involved in a pursuit, describe the responsibility of each authorized unit and the role of each peace officer and supervisor, and specify if and when additional units are authorized. [¶] (3) Determine the communication procedures to be followed during a pursuit. Specify pursuit coordination and control procedures and determine assignment of communications responsibility by unit and organizational entity. [¶] (4) Determine the role of the supervisor in managing and controlling a pursuit. Supervisory responsibility shall include management and control of a pursuit, assessment of risk factors associated with a pursuit, and when to terminate a pursuit. [¶] (5) Determine driving tactics and the circumstances under which the tactics may be appropriate. [¶] (6) Determine authorized pursuit intervention tactics. Pursuit intervention tactics include, but are not limited to, blocking, ramming, boxing, and roadblock procedures. The policy shall specify under what circumstances and conditions each approved tactic is authorized to be used. [¶] (7) Determine the factors to be considered by a peace officer and supervisor in determining speeds throughout a pursuit. Evaluation shall take into consideration public safety, peace officer safety, and safety of the occupants in a fleeing vehicle. [¶] (8) Determine the role of air support, where available. Air support shall include coordinating the activities of resources on the ground, reporting on the progress of a pursuit, and providing peace officers and supervisors with information to evaluate whether or not to continue the pursuit. [¶] (9) Determine when to terminate or discontinue a pursuit. Factors to be considered include, but are not limited to, all of the following: [¶] (A) Ongoing evaluation of risk to the public or pursuing peace officer. [¶] (B) The protection of the public, given the known or reasonably suspected offense and apparent need for immediate capture against the risks to the public and peace officers. [¶] (C) Vehicular or pedestrian traffic safety and volume. [¶] (D) Weather conditions. [¶] (E) Traffic conditions. [¶] (F) Speeds. [¶] (G) Availability of air support. [¶] (H) Procedures when an offender is identified and may be apprehended at a later time or when the location of the pursuit vehicle is no longer known. [¶] (10) Determine procedures for apprehending an offender following a pursuit. Safety of the public and peace officers during the law

10

plaintiffs contend defendants failed to establish as a matter of law that BPD both "adopt[ed] and promulgate[d]" such a policy *and* "provide[d] regular and periodic training on an annual basis" on its policy, as required in subdivisions (b)(1), (2) and (d) of section 17004.7.

Although section 17004.7 does not define the word "adopt," subdivision (b)(2) defines the word "promulgate" as follows: "Promulgation of the written policy under paragraph (1) shall include, but is not limited to, a requirement that all peace officers of the public agency certify in writing that they have received, read, and understand the policy. The failure of an individual officer to sign a certification shall not be used to impose liability on an individual officer or a public entity."

Subdivision (d) of section 17004.7 defines the words "regular and periodic training" as follows: " 'Regular and periodic training' under this section means annual training that shall include, at a minimum, coverage of each of the subjects and elements set forth in subdivision (c) and that shall comply, at a minimum, with the training guidelines established pursuant to Section 13519.8 of the Penal Code."

---

enforcement effort to capture an offender shall be an important factor. [¶] (11) Determine effective coordination, management, and control of interjurisdictional pursuits. The policy shall include, but shall not be limited to, all of the following: [¶] (A) Supervisory control and management of a pursuit that enters another jurisdiction. [¶] (B) Communications and notifications among the agencies involved. [¶] (C) Involvement in another jurisdiction's pursuit. [¶] (D) Roles and responsibilities of units and coordination, management, and control at the termination of an interjurisdictional pursuit. [¶] (12) Reporting and postpursuit analysis as required by Section 14602.1. Establish the level and procedures of postpursuit analysis, review, and feedback. Establish procedures for written postpursuit review and followup."

Subdivision (a)(1) of Penal Code section 13519.8 in turn provides:  "The commission shall implement a course or courses of instruction for the regular and periodic training of law enforcement officers in the handling of high-speed vehicle pursuits and shall also develop uniform, minimum guidelines for adoption and promulgation by California law enforcement agencies for response to high-speed vehicle pursuits.  The guidelines and course of instruction shall stress the importance of vehicle safety and protecting the public at all times, include a regular assessment of law enforcement's vehicle pursuit policies, practices, and training, and recognize the need to balance the known offense and the need for immediate capture against the risks to officers and other citizens of a high-speed pursuit.  These guidelines shall be a resource for each agency executive to use in the creation of a specific pursuit policy that the agency is encouraged to adopt and promulgate, and that reflects the needs of the agency, the jurisdiction it serves, and the law."[5]

_____

[5]     Subdivisions (a)(2), (b), (c), (d) and (e) of Penal Code section 13519.8 provide: "[(a)](2) As used in this section, 'law enforcement officer' includes any peace officer of a local police or sheriff's department or the California Highway Patrol, or of any other law enforcement agency authorized by law to conduct vehicular pursuits. [¶] (b) The course or courses of basic training for law enforcement officers and the guidelines shall include adequate consideration of each of the following subjects: [¶] (1) When to initiate a pursuit. [¶] (2) The number of involved law enforcement units permitted. [¶] (3) Responsibilities of primary and secondary law enforcement units. [¶] (4) Driving tactics. [¶] (5) Helicopter assistance. [¶] (6) Communications. [¶] (7) Capture of suspects. [¶] (8) Termination of a pursuit. [¶] (9) Supervisory responsibilities. [¶] (10) Blocking, ramming, boxing, and roadblock procedures. [¶] (11) Speed limits. [¶] (12) Interjurisdictional considerations. [¶] (13) Conditions of the vehicle, driver, roadway, weather, and traffic. [¶] (14) Hazards to uninvolved bystanders or motorists. [¶] (15) Reporting and postpursuit analysis. [¶] (c)(1) All law enforcement officers who have received their basic training before January 1, 1995, shall participate in supplementary training on high-speed vehicle pursuits, as prescribed and certified by the commission. [¶] (2) Law enforcement

12

The "commission," for purposes of Penal Code section 13519.8, is defined in Penal Code section 13500, subdivision (a) as the Department of Justice's "Commission on Peace Officer Standards and Training" (POST).

C. *Analysis*

Applying the principles of statutory interpretation, we conclude that the promulgation language of section 17004.7, subdivision (b)(2) is unambiguous in its requirement that "*all* peace officers of the public agency certify in *writing* that they have received, read, and understand" the agency's vehicle pursuit policy.  (Italics added.)  In a case such as the instant one where there are various iterations of an agency's vehicle pursuit policy dating back years, we further conclude the certification required by subdivision (b)(2) of section 17004.7 must be to the policy that is in effect at the time of the collision of the "vehicle being operated by an actual or suspected violator of the law who is being, has been, or believes he or she is being or has been, pursued in a motor vehicle by a peace officer employed by the public entity" (§ 17004, subd. (b)(1)).

agencies are encouraged to include, as part of their advanced officer training program, periodic updates and training on high-speed vehicle pursuit.  The commission shall assist where possible. [¶] (d)(1) The course or courses of instruction, the learning and performance objectives, the standards for the training, and the guidelines shall be developed by the commission in consultation with appropriate groups and individuals having an interest and expertise in the field of high-speed vehicle pursuits.  The groups and individuals shall include, but not be limited to, law enforcement agencies, police academy instructors, subject matter experts, and members of the public. [¶] (2) The commission, in consultation with these groups and individuals, shall review existing training programs to determine the ways in which high-speed pursuit training may be included as part of ongoing programs. [¶] (e) It is the intent of the Legislature that each law enforcement agency adopt, promulgate, and require regular and periodic training consistent with an agency's specific pursuit policy that, at a minimum, complies with the guidelines developed under subdivisions (a) and (b)."

13

Our conclusion that the promulgation requirement of section 17004.7 is unambiguous is further supported by case law interpreting the former version of that statute and the Legislature's amendment of the statute in response. In *Nguyen v. City of Westminster* (2002) 103 Cal.App.4th 1161 (*Nguyen*), an individual was killed after police officers chased a stolen van into a high school parking lot as classes were ending. The van struck a trash dumpster that hit the decedent. The *Nguyen* court "reluctantly" concluded summary judgment was properly granted under former section 17004.7. (See *id.* at p. 1163.)

Former section 17004.7 at issue in *Nguyen* provided in part as follows:

"(b) A public agency employing peace officers which adopts a written policy on vehicular pursuits complying with subdivision (c) is immune from liability for civil damages for personal injury to or death of any person or damage to property resulting from the collision of a vehicle being operated by an actual or suspected violator of the law who is being, has been, or believes he or she is being or has been, pursued by a peace officer employed by the public entity in a motor vehicle. [¶] (c) If the public entity has adopted a policy for the safe conduct of vehicular pursuits by peace officers, it shall meet all of the following minimum standards: [¶] (1) It provides that, if available, there be supervisory control of the pursuit. [¶] (2) It provides procedures for designating the primary pursuit vehicle and for determining the total number of vehicles to be permitted to participate at one time in the pursuit. [¶] (3) It provides procedures for coordinating operations with other jurisdictions. [¶] (4) It provides guidelines for determining when

14

the interests of public safety and effective law enforcement justify a vehicular pursuit and when a vehicular pursuit should not be initiated or should be terminated."

The *Nguyen* court found the public agency's vehicle pursuit policy to be "poorly organized" (*Nguyen*, *supra*, 103 Cal.app.4th at p. 1166) and questioned whether (former) section 17004.7 achieved "all" of its legislative goals (*id.* at p. 1165). The court nonetheless concluded that, " 'if the agency adopts a pursuit policy which meets the statutory requirements, then immunity results.' " (*Id.* at p. 1167.) The court noted that the " 'extent to which the policy was *implemented in general* and was followed in the particular pursuit is irrelevant.' " (*Ibid.*, italics added.)

At the conclusion of its opinion, the *Nguyen* court suggested the Legislature reconsider (former) section 17004.7, remarking: "In so deciding this case, we wish to express our displeasure with the current version of section 17004.7. As noted, one reason for extending immunity to a public entity that adopts a written policy on vehicle pursuits is to advance the goal of public safety. But the law in its current state simply grants a 'get out of liability free card' to public entities that go through the formality of adopting such a policy. There is no requirement the public entity *implement the policy through training or other means*. Simply adopting the policy is sufficient under the current state of the law. [Citations.]

"Unfortunately, the adoption of a policy which may never be implemented is cold comfort to innocent bystanders who get in the way of a police pursuit. We do not know if the policy was followed in this instance, and that is precisely the point: We will never

15

know because defendant did not have to prove [the pursuing officer] or the other police officers participating in this pursuit followed the policy.  It is especially chilling that this particular instance occurred on the property of a school where students were present, but it is also sad that one blameless person was seriously injured as a result of the pursuit, and that his family has no option for redress.

"We urge the Legislature to revisit this statute and seriously reconsider the balance between public entity immunity and public safety.  The balance appears to have shifted too far toward immunity and left public safety, as well as compensation for innocent victims, twisting in the wind." (*Nguyen*, *supra*, 103 Cal.App.4th at pp. 1168-1169, italics added.)

Following *Nguyen,* the Legislature in 2005 amended former section 17004.7 (Stats. 2005, ch. 485, § 11), which became operative on July 1, 2007.[6]  (See § 17004.7, subd. (g).)  In its analysis of Senate Bill 719 (SB 719), which included the proposed amendment to former section 17004.7, the Senate Committee on Public Safety explained that a "public agency that employs peace officers to drive emergency vehicles and authorizes vehicle pursuits shall develop, adopt, *promulgate*, and provide regular and periodic training for those peace officers in accordance with the agency's pursuit policy that meets the guideline requirements set forth in section 13519.8 of the Penal Code." (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 719 (2005-2006 Reg. Sess.) April

---

[6]     Before the current version of section 17004.7 became effective on July 1, 2007, the Legislature in connection with its amendment of former section 17004.7 adopted an interim statute that was effective January 1, 2006 until July 1, 2007.  (Stats. 2005, ch. 485, § 10.)

26, 2005, p. 3, italics added.) The Senate Committee on Public Safety made clear that in order for a public agency to be immune, "the agency must not only adopt a written policy but *promulgate* it . . . ." (*Ibid*., italics added.)

The Senate Committee on Public Safety further explained that SB 719 was designed to "reduce collisions, injuries and fatalities that result when suspects flee from law enforcement agencies. According to the statistics from the National Highway Safety Administration, California has consistently led the nation in the past 20 years in fatalities from crashes involving police pursuits. Pursuit driving is a dangerous activity that must be undertaken with due care and the understanding of specific risks as well as the need for a realistic proportionate response to apprehend a fleeing suspect who poses a danger to the public. SB 719 would help guide the development of minimum statewide pursuit policies that balance the immediate need to apprehend a fleeing suspect and the publics' safety on our roads and highways. SB 719 would also help decrease peace officer pursuits through public education, enforcement, and regular and periodic training of peace officers. . . .

"Under existing law, in order for an agency to have immunity from civil liability arising from injury, death or property damage occurring as a result of a police pursuit, an agency must adopt a policy on peace officer pursuits. The law does not however require the agency to implement the policy nor does it set any minimum standards for the policy. This bill provides that an agency will only get immunity if they not only adopt a policy but also *promulgate* it and provide regular and periodic training on the policy. The policy

17

must, at a minimum, comply with the guidelines set forth by POST." (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 719 (2005-2006 Reg. Sess.) April 26, 2005, p. 5, italics added.)[7]

In its analysis of SB 719, the Senate Judiciary Committee noted the proposed amendment to (former) section 17004.7 would "*narrow* the available immunity for public entities that employ peace officers when a third party is injured or killed in a collision with a person fleeing from peace officer pursuit. Such entities would be immune only if they: (1) adopted *and promulgated* a policy for safe conduct of motor vehicle pursuits that met minimum state standards; and (2) provided regular and periodic training for their officers regarding safe pursuits." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 719 (2005-2006 Reg. Sess.) May 10, 2005, p. 1, italics added.)

The Senate Judiciary Committee explained the need for the amendment as follows: "SB 719 is the most recent in a series of bills that have attempted to limit the expansive immunity that currently protects public entities from liability when employee peace officers are involved in high speed pursuits that cause injury or death to innocent third parties. The overbreadth of the current doctrine was brought into high relief in a 2002 case where a high school student was killed in a collision on the grounds of his school after a police vehicle chased a stolen van into the school parking lot. [Nguyen v.

---

[7] We note that in analyzing the "existing law" under (former) section 17004.7, the Senate Committee on Public Safety cited among other cases *Nguyen* and *Kishida v. State of California* (1991) 229 Cal.App.3d 329 (*Kishida*). We further note the trial court in the instant case expressly relied on *Kishida*, a case interpreting *former* section 17004.7, in granting summary judgment.

18

City of Westminster (2002) 103 Cal.App.4th 1161.]  The Nguyen court held it could not consider evidence indicating that the officers' decision to pursue the van onto school property was 'unreasonable and reckless,' and could not consider whether or how the vehicular pursuit policy established by the entity had been implemented.  [Id. at 1167-68.]  In deciding to grant immunity, the court held it could only consider the fact that a pursuit policy had been 'adopted' by the entity.

"Previous bills that followed the Nguyen decision, SB 219 (Romero, 2003) and SB 1866 (Aanestad, 2004), sought to rectify this clear imbalance by establishing that public entities are not immune from liability relating to vehicular pursuits unless the officers involved were obeying the entities' pursuit policy at the time of the injury.  Law enforcement representatives objected to the proposed solutions in those bills as too extreme.

"This bill [i.e., SB 719] is proposed as a more moderate approach to balance the various interests, requiring entities to implement pursuit policies and mandate training of their officers, and requiring that penalties be increased and public information made available regarding those penalties."  (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 719 (2005-2006 Reg. Sess.) May 10, 2005, pp. 1-2.)

The Senate Judiciary Committee further explained that SB 719 was "a negotiated alternative to previous proposed [legislative] solutions" (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 719 (2005-2006 Reg. Sess.), May 10, 2005, p. 4, emphasis in original); and that unlike the holding of *Kishida*, which interpreted the statute not to

19

"require implementation of such a policy" (*id.* at p. 3), SB 719 "establish[ed] that a public entity cannot receive immunity under Section 17004.7 unless it has first adopted <u>and</u> <u>promulgated</u> a written policy for safe motor vehicle pursuits that meets minimum standards established by this bill" (*id.* at p. 4, emphasis in original).

This legislative history highlights the important public policy underlying the promulgation requirement in (current) section 17004.7 and clearly shows this requirement, among others, was added by our Legislature in response to *Nguyen*, *Kishida* and other pre-2005 amendment cases (see, e.g., *Brumer v. City of Los Angeles* (1994) 24 Cal.App.4th 983, 987; *Weiner v. City of San Diego* (1991) 229 Cal.App.3d 1203, 1208-1211), after (former) section 17004.7 had been interpreted to provide blanket immunity when an agency merely "adopted" a vehicle pursuit policy that met what were then minimal statutory requirements. (See *Nguyen*, *supra*, 103 Cal.App.4th at pp. 1164-1165.)

Our conclusion that an agency's vehicle pursuit policy is not "promulgated" within the meaning of subdivision (b)(2) of section 17004.7 unless, at a minimum, "all" of its peace officers "certify in writing that they have received, read and understand the policy" is further supported by the POST commission. The Post commission website (<https://post.ca.gov>) states under "Home/General Questions/Vehicle Pursuit Guidelines" that in addition to providing annual training, an agency also "must provide all peace officers with a copy of the agency pursuit policy." (<https://post.ca.gov/general-questions.aspx>) It then goes on to state, "[p]eace officers must also sign an attestation form (doc) that states they have 'received, read, and

20

understand' the agency pursuit policy.  The agency must retain this form."  (*Ibid.*)  Included on the website is a link to the "attestation form." (For convenience, we have attached the "attestation form" as Appendix A, *post*, page 30*.*)

The "attestation form" is entitled "SB 719 Pursuit Policy Training Attestation."  It includes boxes for "Officer Identification"; "Training Specifications"; and "Attestation." (<http://post.ca.gov/general-questions.aspx>)  Under "Attestation," the form states that pursuant to "Vehicle Code § 17400.7(b)(2)," the officer has "received, read, and understand[s] [his or her] agency's vehicle pursuit policy."  The form requires the officer to sign, print his or her name, and date the form.

Similarly, section 314.10 of BPD's Policy 314 in effect at the time of the April 17, 2011 collision unambiguously required "[e]ach member [to] certify in writing that [he or she has] received, read and understand[s] this policy initially and upon any amendments.  Such record shall be maintained in each member[']s training file."  Thus, BPD's own policy supports the conclusion that "promulgation" required all peace officers to "certify in writing that they have received, read and understand the policy."

Defendants nonetheless contend subdivision (b)(2) of section 17004.7 allegedly "provides leniency where an officer may not have attested to the review and receipt of the policy," noting that in such circumstances the agency is still entitled to statutory immunity.  Specifically, defendants rely on the last sentence of subdivision (b)(2), which as noted *ante* provides: "The failure of an individual officer to sign a certification shall

21

not be used to impose liability on an individual officer or a public entity."  (§ 17004.7, subd. (b)(2).)  This contention is unavailing.

Defendants' argument confuses the concepts of liability and immunity.  Although subdivision (b)(2) of section 17004.7 expressly provides *liability* cannot be imposed on an officer or a public agency merely because a peace officer failed to sign a certification as required by that subdivision, that does not mean that an agency, ipso facto, is nonetheless entitled to *immunity* as provided under section 17004.7, even if the agency's vehicle pursuit policy was not properly promulgated as required by the plain language of the statute.

In addition, defendants' proposed interpretation of 17004.7, subdivision (b)(2) would eviscerate the certification requirement in the current version of the statute and undermine the important public policy of promulgation of an agency's vehicle pursuit policy.  We thus reject defendants' interpretation of subdivision (b)(2) of section 17004.7, which, in our view, is more consistent with the law under *former* section 17004.7 as discussed in *Nguyen* and other pre-2005 amendment cases.  (See *Yohner*, *supra*, 237 Cal.App.4th at p. 8 [noting we interpret a statute to comport " ' " 'with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute' " ' "].)

We also reject defendants' contention that BPD properly "promulgated" its vehicle pursuit policy within the meaning of subdivision (b) of section 17004.7 because BPD allegedly disseminated the policy to all of its officers within the department and because

22

BPD also had in place a policy that required its officers to review and acknowledge any policy disseminated.

With respect to the first point, defendants in support of their motion included the declaration of Greg Fagan, a police commander with BPD. Commander Fagan declared that Policy 314 was adopted before 2007; that revisions to that policy would be made as laws changed and updates were needed; that around 2002, BPD retained "Lexipol, a third party risk management service to assist and play a major [role] in policy drafting and adopting, including but not limited to BPD pursuit policy"; and that Lexipol used software and database programs "accessible by BPD and its officers."

Commander Fagan described the process BPD administrators used in updating its policies: "Through the Lexipol service, BPD administrators would electronically receive from Lexipol a menu of different amendments and clauses that BPD could make a part of their policies, and then once that was done, Lexipol would finalize the policy electronically; and then BPD administrators such as myself . . . would then electronically approve and adopt them, and then the revised policy, No. 314 in this case, would be released or disseminated to department employees. This was the process in place since Lexipol was selected to provide policy preparation, implementation, and adoption services to the department.

"Each BPD employee during this time had their own work email account. When the policy was approved/adopted, such as BPD No. 314, then an administrator, such as myself, would send out an email to all department employees advising them that a policy,

23

such as Vehicle Pursuit Policy No. 314, has been changed. The email directed each employee to access the revised or updated policy either directly through the Lexipol service which they had access to, or by accessing the revised policy on the department shared drive, where the revised policy had been placed, and all employees had access. I am certain that such emails were sent out to all department employees. Employees would then acknowledge receipt of the policy, as required by department policy, by email. Emails such as these are *not* maintained or preserved, as part of department policy." He further noted that, pursuant to policy Nos. 106.4 and 106.4.1, discussed briefly *post*, "all officers would be required to acknowledge receipt by return email of any new policies or revisions, and seek clarification as needed" and that the "vast majority of BPD officers comply with this acknowledgement process." Finally, he noted "Exhibit G" attached to defendants' motion was an example of a Lexipol-based distribution report for employees for BPD's entire manual, which included Policy 314, dated March 3, 2011.

Commander Fagan's declaration makes clear the lack of evidence proffered by defendants to establish that BPD as a matter of law promulgated its vehicle pursuit policy as required under subdivision (b) of section 17004.7. Indeed, his declaration shows that each peace officer could access Policy 314 either "directly through the Lexipol service" or through the "department shared drive." Instead of certifying in writing as required by subdivision (b)(2) of section 17004.7 that BPD's vehicle pursuit policy had been "received, read, and under[stood]," BPD peace officers instead used email to acknowledge mere "receipt" of the policy. As repeatedly noted *ante*, however, unlike

24

former section 17004.7, current section 17004.7, subdivision (b)(2) requires more than mere "receipt" of the policy in order for immunity to apply.

What's more, Commander Fagan admitted in his declaration that peace officer emails acknowledging mere "receipt" of Policy 314 (contained within the broader BPD policy manual) were *not* kept by the department. Assuming, without deciding, that an email acknowledgement satisfies the "writing" certification requirement in subdivision (b)(2) of section 17004.7, we conclude the record is devoid of evidence showing that each BPD peace officer in fact acknowledged he or she "received, read, and under[stood]" Policy 314. Our conclusion is further buttressed by the fact that Commander Fagan admitted in his declaration that only a "vast majority" of, as opposed to the statutory requirement of *all*, BPD peace officers used email to acknowledge the "receipt" of Policy 314. For these separate and independent reasons, we conclude defendants have failed to establish Policy 314 was promulgated as required by the plain language of subdivision (b) of section 17004.7.

Moreover, the Lexipol-based distribution report referenced by Commander Fagan in his declaration (i.e., exhibit G) also does not establish BPD promulgated its vehicle pursuit policy as required under the statute. In fact, that report actually supports the opposite finding. In categorizing individuals in the report as "sworn" and "[n]on-sworn," it appears about 43 sworn individuals had "[n]ot [a]ccepted" the policy published on

25

March 3, 2011 that Commander Fagan noted was directly available to peace officers through the Lexipol service network.[8]

In contrast, another Lexipol-based distribution report produced by defendants at the deposition of Commander Fagan shows eight sworn individuals had "[a]ccepted" that policy. This report further shows, however, that of the eight that had "[a]ccepted" the policy, one of those individuals appears to have "[a]ccepted" or acknowledged receipt of the policy *after* the April 17, 2011 vehicle pursuit involving Durnin.

Thus, we conclude the Lexipol-based distribution reports produced by defendants does not satisfy the requirement in subdivision (b)(2) of section 17004.7 that *each* BPD officer certify he or she has "received, read, and under[stood]" Policy 314. We further conclude acknowledgement of receipt of the policy *after* the vehicle pursuit in question also does not satisfy the promulgation requirement of subdivision (b) of section 17004.7.

As to defendants' second point—that BPD also had in place a policy that required its officers to review and acknowledge any policy disseminated (including Policy 314)— we also reject this contention for the reasons just given. In our view, an agency cannot skirt the express statutory requirements of promulgation set forth in subdivision (b) of section 17004.7 merely by adopting a general policy requiring all of its peace officers to "review and acknowledge" any change to an agency's policy or polices. In any event, as

---

8        The Lexipol report further shows that about 21 "[n]on-sworn" individuals had "[n]ot [a]ccepted" and about two had "[a]ccepted" the policy through the Lexipol network service. Given that the promulgation requirement in subdivision (b) of section 17004.7 is expressly limited to "peace officers," the number of non-sworn individuals not accepting the policy would appear to have no bearing on our analysis.

we already have noted, the mere "receipt" and "acknowledgment" of a policy revision in no way satisfies the promulgation requirement of subdivision (b) of section 17004.7.[9]

---

[9] In light of our conclusion summary judgment was improper because defendants did not proffer evidence showing as a matter of law that they promulgated BPD's vehicle pursuit policy as required under subdivision (b) of section 17004.7, we deem it unnecessary to decide in this case plaintiffs' alternate contentions that summary judgment was improper because BPD allegedly failed to "adopt" Policy 314 as required by subdivision (b)(1) of section 17004.7 or because BPD did not establish its provided "regular and periodic training on an annual basis" for vehicle pursuits as required by subdivisions (b)(1) and (d) of this statute. Because we did not reach the latter issue, we reject defendants' contention that plaintiffs' opening brief allegedly was deficient because plaintiffs allegedly raised issues regarding peace officer training (or the lack thereof) that were based on an incomplete record. In addition, we note the evidence of Officer Stehli's training records and a copy of the audio files from BPD dispatch of the subject pursuit, which defendants pointed out were also not in the record, were subsequently included in the appellate record by court order.

## II

## Negligence

Defendants separately contend summary judgment was properly granted because the trial court alternatively found the accident involving decedent Morgan "did not occur as a result of any negligence on the part of the officer because the chase was terminated before the collision." In our independent review of the record, it appears that the trial court made this statement as an afterthought, toward the end of the hearing; that the court expressly refused to rely on negligence principles in granting summary judgment, noting "we don't need to get there because the court is finding that [defendants] had a [vehicle pursuit] policy and a procedure in place"; and that the summary judgment order and the judgment based thereon did not rely on negligence principles as an alternate basis for granting defendants relief.

We recognize, however, that we may affirm summary judgment "if it is correct on any legal ground applicable to this case, whether that ground was the legal theory adopted by the trial court or not, and whether it was raised by defendant in the trial court or first addressed on appeal." (*Jordan*, *supra*, 148 Cal.App.4th at p. 1071.) Here, we conclude that, at a minimum, there are triable issues of material fact on the issue of causation, which we discern to be the basis of the trial court's fleeting statement that Officer Stehli was not negligent.[10]

---

[10] We note plaintiffs proffered expert testimony from Stephen L. D'Arcy in support of their opposition to the motion. D'Arcy opined that Officer Stehli's vehicle pursuit of the pickup was "unsafe and unreasonable" under the circumstances, which he described as including the "lack of seriousness of the traffic infraction, having the identity and the

28

Indeed, as noted *ante* the record is less than clear regarding whether Officer Stehli terminated the pursuit mere seconds *before* or *after* the collision or at the *same time* he saw a "cloud of dirt" ahead of him as he continued in his police cruiser on Soboba Road. Officer Stehli declared he decided to terminate the pursuit at 11:19:54 when he turned off his police cruiser's siren (but not lights), saw a "cloud of dirt" and came upon the collision at 11:20:10, a mere *16 seconds* later.

Moreover, the record shows that Officer Stehli pursued Durnin for nearly 12 minutes, as Durnin drove through multiple stop signs and red traffic signals, crossed over into oncoming traffic and drove at speeds of close to 90 miles per hour. The record also shows that Durnin himself still believed he was being pursued by police at the time he collided with Morgan, inasmuch as just *seconds* before Durnin had crossed over a double-yellow line into oncoming traffic in order to evade police.

In light of this evidence, we conclude the causation issue is one for the trier of fact. (See *Lawrence v. La Jolla Beach and Tennis Club, Inc.* (2014) 231 Cal.App.4th 11, 33 [noting causation, like breach of duty, is " 'ordinarily a question of fact which cannot be resolved by summary judgment' " and noting the " 'issue of causation may be decided as a question of law only if, under undisputed facts, there is no room for a reasonable difference of opinion' "].) As such, we further conclude defendants were not entitled to summary judgment based on negligence principles.

---

address of the registered owner, traveling at speeds between 70-89 miles per hour during a weekday and work hours, blowing through a red light, lost radio communications and lack of supervision during the pursuit."

DISPOSITION

The judgment in favor of defendants is reversed. Plaintiffs to recover their costs of appeal.

BENKE, Acting P. J.

WE CONCUR:

McINTYRE, J.

O'ROURKE, J.

## Appendix A

# SB 719 Pursuit Policy Training Attestation

INTERNAL AGENCY USE ONLY – DO NOT SEND TO POST

**Officer Identification**

| Last | First | Middle |
|------|-------|--------|
| | | |

| ID # | Assignment | |
|------|-----------|--|
| | | |

| Station | Telephone | Fax |
|---------|-----------|-----|
| | | |

| Email | Other |
|-------|-------|
| | |

| Training Date | Location | |
|---------------|----------|--|
| | | |

| Instructor | Instructor ID# |
|------------|----------------|
| | |

| Course Name | Course # | Hours |
|-------------|----------|-------|
| | | |

| Other/Notes |
|-------------|
| |

**Pursuant to Vehicle Code §17004.7(b)(2), I have received, read, and understand my agency's vehicle pursuit policy.**

| Signature |
|-----------|
| |

| Print Name | Date |
|------------|------|
| | |