Filed 12/17/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| WILLIAM RILEY,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>ALAMEDA COUNTY SHERIFF'S OFFICE,<br><br>      Defendant and Respondent. | A156407<br><br>(Alameda County<br>Super. Ct. No. RG15791353) |

Vehicle Code section 17004.7[1] provides a public agency immunity from liability for collisions involving vehicles being pursued by peace officers if the agency "adopts and promulgates a written policy on, and provides regular and periodic training on an annual basis for, vehicular pursuits . . . ."  (§ 17004.7, subd. (b)(1); see also *Ramirez v. City of Gardena* (2018) 5 Cal.5th 995, 997 (*Ramirez*).)  Plaintiff and appellant William Riley (Riley) was injured when a car being pursued by officers employed by defendant and respondent Alameda County Sheriff's Office (Sheriff) ran a red light and collided with Riley's motorcycle.  The trial court granted the Sheriff summary judgment under section 17004.7.  On appeal, Riley contends the court erred, arguing the Sheriff's policy, promulgation of the policy, and training did not comply with section 17004.7.  We affirm.

BACKGROUND

Because our decision does not turn on the circumstances of the underlying incident, we provide only a brief summary.  On October 29, 2014, Riley was riding a

---

[1] All undesignated statutory references are to the Vehicle Code.

motorcycle through a green light on High Street at International Boulevard in Oakland, when he was struck by a car fleeing from Sheriff's deputies in marked cars.[2]  The suspects in the car that struck Riley were suspected of theft and the car had been reported as stolen.  Riley traveled on the hood of the car for some distance, until the car crashed. Riley suffered serious bodily injury.

In October 2015, Riley filed suit against the Sheriff, individual deputies, and the suspects and other persons associated with them.  In February 2016, Riley filed his Second Amended (and operative) Complaint (Complaint).  In June 2016, defaults were entered against the suspects and others associated with them.  In July 2016, the trial court sustained the Sheriff's demurrer without leave to amend as to three of the causes of action in the Complaint.  The court also dismissed the individual officers from the action.

In April 2018, Riley filed a motion for summary adjudication, and, in May, the Sheriff filed a motion for summary judgment or adjudication.  In December, the trial court granted the Sheriff's motion for summary judgment and denied Riley's motion, concluding the Sheriff is entitled to immunity under section 17004.7.

The trial court entered judgment in favor of the Sheriff and this appeal followed.

DISCUSSION

Riley contends the trial court erred in granting summary judgment because the Sheriff's pursuit policy, promulgation of the policy, and training did not comply with section 17004.7.  We reject his contentions.

I.      *Summary of Section 17004.7*

" 'Except as otherwise provided by statute,' a 'public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person.'  (Gov. Code, § 815, subd. (a).)  [S]ection 17001 creates a statutory exception to public entities' general tort immunity: 'A public entity is liable for death or injury to person or property proximately caused by a negligent or wrongful act

---

[2] Riley does not dispute the deputies had been directed to terminate the pursuit before the collision, but he argues the evidence shows the deputies did not discontinue pursuit.  The factual dispute is not relevant to the issues on appeal.

2

or omission in the operation of any motor vehicle by an employee of the public entity acting within the scope of his employment.' 'Section 17004.7 in turn limits the liability that . . . section 17001 otherwise permits by affording immunity to public agencies that adopt and implement appropriate vehicle pursuit policies.' " (*Ramirez*, *supra*, 5 Cal.5th at p. 999.)

Subdivision (b) of section 17004.7 provides: "(1) A public agency employing peace officers that adopts and promulgates a written policy on, and provides regular and periodic training on an annual basis for, vehicular pursuits complying with subdivisions (c) and (d) is immune from liability for civil damages for personal injury to or death of any person or damage to property resulting from the collision of a vehicle being operated by an actual or suspected violator of the law who is being, has been, or believes he or she is being or has been, pursued in a motor vehicle by a peace officer employed by the public entity. [¶] (2) Promulgation of the written policy under paragraph (1) shall include, but is not limited to, a requirement that all peace officers of the public agency certify in writing that they have received, read, and understand the policy. The failure of an individual officer to sign a certification shall not be used to impose liability on an individual officer or a public entity."

Subdivision (c) of section 17004.7 contains "detailed requirements" for pursuit policies. (*Ramirez*, *supra*, 5 Cal.5th at p. 999, fn. 1.) The section specifies twelve "minimum standards" that "[a] policy for the safe conduct of motor vehicle pursuits by peace officers shall meet . . . ." (§ 17004.7, subd. (c).) As relevant in the present case, minimum standard number seven is "Determine the factors to be considered by a peace officer and supervisor in determining speeds throughout a pursuit. Evaluation shall take into consideration public safety, peace officer safety, and safety of the occupants in a fleeing vehicle." (*Ibid.*) And minimum standard number eight is "Determine the role of air support, where available. Air support shall include coordinating the activities of resources on the ground, reporting on the progress of a pursuit, and providing peace officers and supervisors with information to evaluate whether or not to continue the pursuit."

3

Subdivision (b) of section 17004.7 requires a public agency to provide "regular and periodic training" regarding its pursuit policy, and section 17004.7, subdivision (d), defines that as "annual training that shall include, at a minimum, coverage of each of the subjects and elements set forth in subdivision (c) and that shall comply, at a minimum, with the training guidelines established pursuant to Section 13519.8 of the Penal Code." Penal Code section 13519.8 provides that the Commission on Peace Officer Standards and Training (POST Commission) "shall implement a course or courses of instruction for the regular and periodic training of law enforcement officers in the handling of high-speed vehicle pursuits." (See also Pen. Code, § 13500, subd. (a); *Ramirez*, *supra*, 5 Cal.5th at p. 999, fn. 1.) Penal Code section 13519.8, subdivision (b), provides that "The course or courses of basic training for law enforcement officers and the guidelines shall include adequate consideration of" 15 specific subjects, including "speed limits."[3]

Penal Code section 13519.8, in addition to providing for development of the training guidelines referenced in Section 17004.7, subd. (d), also provides for the development of vehicle pursuit guidelines (Guidelines). Thus, section 13519.8, subdivision (a)(1) of the Penal Code states, "The commission shall implement a course or courses of instruction for the regular and periodic training of law enforcement officers in the handling of high-speed vehicle pursuits and shall also develop uniform, minimum guidelines for adoption and promulgation by California law enforcement agencies for response to high-speed vehicle pursuits. The guidelines and course of instruction shall stress the importance of vehicle safety and protecting the public at all times, include a regular assessment of law enforcement's vehicle pursuit policies, practices, and training, and recognize the need to balance the known offense and the need for immediate capture

---

[3] The subjects listed in Penal Code section 13519.8, subdivision (b), include: "(1) When to initiate a pursuit. (2) The number of involved law enforcement units permitted. (3) Responsibilities of primary and secondary law enforcement units. (4) Driving tactics. (5) Helicopter assistance. (6) Communications. (7) Capture of suspects. (8) Termination of a pursuit. (9) Supervisory responsibilities. (10) Blocking, ramming, boxing, and roadblock procedures. (11) Speed limits. (12) Interjurisdictional considerations. (13) Conditions of the vehicle, driver, roadway, weather, and traffic. (14) Hazards to uninvolved bystanders or motorists. (15) Reporting and postpursuit analysis."

against the risks to officers and other citizens of a high-speed pursuit. These guidelines shall be a resource for each agency executive to use in the creation of a specific pursuit policy that the agency is encouraged to adopt and promulgate, and that reflects the needs of the agency, the jurisdiction it serves, and the law." The POST Commission's Guidelines are available online; they were published in 1995 and most recently revised in February 2007.[4] Section 17004.7, subdivision (e) references the Guidelines, stating "The requirements in subdivision (c) are consistent with the 1995 California Law Enforcement Vehicle Pursuit Guidelines developed by the Commission on Peace Officer Standards and Training pursuant to Section 13519.8 of the Penal Code that will assist agencies in the development of their pursuit policies."

"The requirement of adoption of a written policy [that] complies with section 17004.7, subdivision (c) obviously was intended to provide entity control over the pursuing officers during a pursuit. [Citation.] The requirement of entity control, we believe, in turn was intended to reduce the number and frequency of unreasonably dangerous pursuits and the resulting accidents." (*Payne v. City of Perris* (1993) 12 Cal.App.4th 1738, 1747 (*Payne*); see also *McGee v. City of Laguna Beach* (1997) 56 Cal.App.4th 537, 542 (*McGee*) ["The immunity is designed to encourage police departments to adopt express safe pursuit guidelines, thereby reducing the frequency of accidents."].)

In 2005, section 17004.7 was amended to its current form, partially in response to a court of appeal decision that observed that the statute granted "a 'get out of liability free card' to public entities that go through the formality of adopting such a policy. There is

---

[4] On our own motion, we take judicial notice of the Guidelines, available at <<https://post.ca.gov/Portals/0/post_docs/publications/Vehicle_Pursuit.pdf?ver=2019-07-16-141238-590>> (as of Dec. 12, 2019). (Evid. Code, § 452, subd. (c); see also *People v. Dawkins* (1992) 10 Cal.App.4th 565, 570–571 [taking judicial notice of POST Commission materials]; *Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872, 887 ["subdivision (c) [of Evidence Code section 452] 'enables courts in California to take notice of a wide variety of official acts . . . . [and] an expansive reading must be provided to certain of its phrases [and] included in 'executive' acts are those performed by administrative agencies . . . .' "].)

no requirement the public entity implement the policy through training or other means. Simply adopting the policy is sufficient under the current state of the law." (*Nguyen v. City of Westminster* (2002) 103 Cal.App.4th 1161, 1168 (*Nguyen*); see also *Ramirez, supra*, 5 Cal.5th at pp. 999–1000; Stats. 2005, ch. 485, § 11, pp. 3825–3827 [Sen. Bill 719 (2005-2006 Reg. Sess.)]; Sen. Comm. on Judiciary, Analysis of Sen. Bill 719, as amended May 5, 2005, at p. 7 [discussing *Nguyen*]; Sen. Comm. on Pub. Safety, Analysis of Sen. Bill 719, as amended May 19, 2005, at p. K [same].) In *Ramirez*, at page 1000, the California Supreme Court observed that "The current section 17004.7 does contain requirements that the public entity implement the policy through training and other means to ensure it is not a mere formality." The 2005 amendments also substantially expanded the list of minimum standards in Section 17004.7, subdivision (c). (Stats. 2005, ch. 485, § 11, pp. 3825–3827.)

II.    *Standard of Review*

A trial court must grant a summary judgment motion when the evidence shows that there is no triable issue of material fact and that the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).) We apply a de novo standard in reviewing a grant of summary judgment. (*Aguilar*, at p. 860.) In making this determination, we view the evidence in the light most favorable to the nonmoving party. (*Id.* at p. 843.)

A defendant moving for summary judgment bears the burden of producing evidence showing that one or more elements of the plaintiff's cause of action cannot be established or, as in the instant case, that there is a complete defense to the cause of action. (Code Civ. Proc., § 437c, subd. (o); *Aguilar, supra*, 25 Cal.4th at pp. 850–851, 854–855.) Once this burden is met, the burden shifts to the plaintiff to produce specific facts showing a triable issue as to the cause of action or defense. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, at p. 850.) Section 17004.7, subdivision (f), provides that "[a] determination of whether a public agency has complied with subdivisions (c) and (d) is a question of law for the court."

6

Where the issues on appeal turn on statutory interpretation, the applicable principles are clear. " '[O]ur fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose.' [Citation.] The well-established rules for performing this task require us to begin by examining the statutory language, giving it a plain and commonsense meaning. [Citation.] We do not, however, consider the statutory language in isolation; rather, we look to the statute's entire substance in order to determine its scope and purposes. [Citation.] That is, we construe the words in question in context, keeping in mind the statute's nature and obvious purposes. [Citation] We must harmonize the statute's various parts by considering it in the context of the statutory framework as a whole. [Citation.] If the statutory language is unambiguous, then its plain meaning controls. If, however, the language supports more than one reasonable construction, then we may look to extrinsic aids, including the ostensible objects to be achieved and the legislative history." (*Los Angeles County Metropolitan Transportation Authority v. Alameda Produce Market, LLC* (2011) 52 Cal.4th 1100, 1106–1107 (*Alameda Produce*).)

III.    *The Sheriff's Pursuit Policy*

In April 2014 the Sheriff adopted a revised version of General Order 5.01, the Sheriff's policy on vehicle pursuits (Policy). The Policy is ten single-spaced pages in length. The stated "PURPOSE" of the Policy is "[t]o establish guidelines for sworn members during vehicle pursuits." The stated overall "POLICY" statement is as follows: "It shall be the policy of this agency to apprehend law violators at every opportunity. Deputies engaged in vehicle pursuits of actual or suspected violators shall proceed in a manner consistent with the safety and well being of all persons. It is recognized that all pursuit situations are different and actions taken during any pursuit may reasonably and necessarily vary. When circumstances are such that the safety of any person is gravely endangered because of the pursuit, it shall be terminated in all but the most exigent circumstances. In all cases, a supervisor, if available, shall monitor and control the pursuit."

7

After the statements of purpose and policy, the Policy defines various relevant terms and describes relevant Vehicle Code provisions, including section 17004.7. The Policy makes clear that its intent is to comply with section 17004.7, asserting that "This General Order meets the criteria set forth in [section 17004.7,] subdivision (c)" and that the minimum standards described therein "are clearly outlined in this order."

The Policy then specifies "PROCEDURES" applicable to vehicle pursuits, including, for example: continuous operation of lights and sirens, broadcast of information to dispatch, notification of a supervisor to monitor the pursuit, determination of availability of air support, and limitations on the number of pursuit vehicles. The Policy contains a section entitled "AIRCRAFT SUPPORT PROCEDURES." It states, "Fixed wing and/or helicopter aircraft may be utilized to support ground operations during a vehicle pursuit." The Policy explains that aircraft personnel are responsible for reporting "observations concerning the progress and conduct of the pursuit" to be "utilized by responding units and monitoring supervisors for the effective deployment and situational analysis necessary to evaluate whether the pursuit should continue or be terminated." The Policy then lists the "types of information" the aircraft personnel may relay, including information relevant to determining the safety risks of continuing pursuit. The Policy directs that "The monitoring Sergeant and Watch Commander will closely monitor the supporting aircraft communications to assist in deciding whether or not to continue the pursuit."

A section of the Policy called "GUIDELINES FOR INITIATING, CONTINUING OR TERMINATING PURSUITS" lists 17 "factors [that] should be considered to determine whether a pursuit should be initiated, continued, or terminated." The factors include, "[t]he seriousness of the originating incident or violation, and the relationship to community safety;" "[s]afety of the public in the area of the pursuit;" "[s]afety of the pursuing deputies;" "[v]olume of vehicular traffic;" "[v]olume of pedestrian traffic;" "[s]peeds involved;" "[t]ime of day;" "[w]eather conditions;" "[r]oad conditions;" "[t]ype of area, e.g., rural, urban, suburban, schools, business, residential, etc;" "[f]amiliarity of the deputy and supervisors with the area of the pursuit;" "[q]uality of radio

8

communications;" "[t]he capability of the patrol vehicle;" "[t]he capability of the deputy driving the patrol vehicle;" "[l]ength of the pursuit;" "[p]resence of a hostage in the vehicle being pursued;" and suspect identification such that "later apprehension can be accomplished." The Policy directs that "A pursuit will be terminated when the factors listed above present an unreasonable risk to deputies and/or the public and outweigh the need for apprehension of the violator."

The Policy provides that "Supervisory and management control will be exercised over all motor vehicle pursuits." The Policy also contains sections addressing arrest procedures, use of force, multi-jurisdictional pursuits, reporting procedures, post-pursuit critique, and annual analysis of pursuits to identify areas for improvement in training and policy.

With respect to training, the Policy states, "The Sheriff's Office shall provide regular and periodic training on an annual basis for all sworn personnel in the handling of high-speed vehicle pursuits. The instruction will be commensurate with the high-speed vehicle pursuit training developed by the [POST Commission] as required by Penal Code Section 13519.8. The training shall be conducted by the Regional Training Center through the use of the 'Pursuit Policy Training Attestation Form' . . . ."

The version of the Policy in effect in October 2014 was adopted by the Sheriff through an October 2013 update. The Sheriff uploaded the Policy into the agency's electronic Document Management System (DMS) pursuant to procedures set forth in the Sheriff's General Order 2.01. When the Policy was uploaded into the DMS, all peace officers employed by the Sheriff automatically received electronic notice of the Policy. General Order 2.01 directs that all disseminated General Orders, such as the Policy, "will be reviewed in a timely manner and signed off electronically in the DMS" by all officers. The electronic sign-off screen states, "Enter your Username and Password in the spaces provided below. The entry of your Username indicates that you have read and understood this document."

General Order 2.01 also states that "Commanding Officers and/or Unit Commanders shall also be responsible for ensuring that every Agency member under

9

their command electronically signs for each such [policy] issuance. The [Regional Training Center[5]] will notify Unit Commanders regarding employees that have not reviewed their DMS mailbox in a timely manner. Each affected employee must electronically sign for the document, indicating he/she is responsible for reviewing and following the applicable Policy and Procedure." The Sheriff's records show that, at the time of the pursuit at issue in the present case, approximately 80% of the agency's peace officers had completed the electronic certification for the Policy.[6]

IV.    *The Trial Court Properly Held the Sheriff is Immune Under Section 17004.7*

Riley contends the trial court erred in granting the Sheriff immunity under section 17004.7. First, he argues the Policy was not properly promulgated within the meaning of section 17004.7, subdivision (b)(2). Second, he argues the Policy fails to satisfy the speed and air support minimum standards in section 17004.7, subdivisions (c)(7) and (c)(8). Finally, he argues the Sheriff has not shown it provides the training required under section 17004.7, subdivision (d). Riley's claims fail.

A.    *Promulgation Requirement*

As noted previously, Section 17004.7, subdivision (b)(2) provides, "Promulgation of the written policy under paragraph (1) shall include, but is not limited to, a requirement that all peace officers of the public agency certify in writing that they have received, read, and understand the policy. The failure of an individual officer to sign a certification shall not be used to impose liability on an individual officer or a public entity." The details of the Policy and its promulgation are set forth above. Riley contends the Policy failed to meet the promulgation requirement for various reasons. Riley's contentions are without merit.

---

[5] General Order 2.01 uses the acronym RTC without defining it, but it appears to refer to the Regional Training Center. (See <<https://www.sheriffacademy.com/>> (as of Dec. 12, 2019).)

[6] Riley cites to deposition testimony that 792 peace officers completed the electronic certification before the October 2014 pursuit. He asserts the Sheriff employed 979 peace officers at the time, although that information is not at the record citation he provided. In any event, the parties agree approximately 80% of the officers had completed the certification.

Riley first argues the Policy fails to satisfy section 17004.7 because the Policy does not contain the officer certification requirement. He points to a statement in *Ramirez*, *supra*, 5 Cal.5th at page 1001, that the "plain meaning" of the certification requirement "is that the policy must contain the requirement." However, although the policy in *Ramirez* happened to contain the certification requirement, the issue there was whether "every peace officer must meet the requirement," not whether the requirement must be contained within the four corners of the pursuit policy itself. (*Ibid.*) Accordingly, *Ramirez* does not stand for that proposition. (*California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1043 ["It is axiomatic that cases are not authority for propositions that are not considered."].)[7] Riley points to nothing in the language of section 17004.7 providing that the certification requirement must be stated in the pursuit policy itself. Instead, section 17004.7, subdivision (b)(2) merely specifies that "Promulgation of the written policy . . . shall include . . . a requirement that all peace officers of the public agency certify in writing that they have received, read, and understand the policy." In the present case, the Sheriff presented evidence showing that the requirement is contained in General Order 2.01, which requires peace officers to sign off on *all* policies, including the Policy at issue in the present case. That is not contrary to the section 17004.7 promulgation requirement.[8]

Riley argues there is no evidence the Sheriff required officers to certify they read and understood the Policy. General Order 2.01 required that the Policy be "reviewed in a timely manner" and "signed off electronically in the DMS." As noted previously, the

---

[7] Contrary to Riley's assertions on appeal, the court in *Morgan v. Beaumont Police Dept.* (2016) 246 Cal.App.4th 144, disapproved of by *Ramirez*, *supra*, 5 Cal.5th 995, did not address the issue. In *Morgan*, the court of appeal merely concluded that electronic acknowledgement of "receipt" of a policy was insufficient to satisfy the requirement that officers certify they "received, read, and understand the policy." (*Morgan*, at pp. 161–163.)

[8] Riley complains that the Sheriff failed to timely produce General Order 2.01 during discovery, but he does not contend the trial court abused its discretion in considering General Order 2.01 in ruling on the Sheriff's motion for summary judgment. Any such contention has been forfeited. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785.)

DMS electronic sign-off screen states, "Enter your Username and Password in the spaces provided below.  The entry of your Username indicates that you have read and understood this document."  Riley argues the screenshot in evidence showing the language accompanying the sign off is from August 2017, *well after* the October 2014 pursuit in the present case.  However, the Sheriff submitted a declaration from the Sheriff's employee responsible for the DMS in which he averred that the electronic certification page had not been changed in that respect since the date of the pursuit.  Accordingly, the 2017 screenshot *was* evidence that officers were required to certify at the time of the pursuit that they "received, read, and understand" (§ 17004.7, subd. (b)(2)) the Policy.[9]

We also reject any contention that the Sheriff failed to comply with section 17004.7 because General Order 2.01 does not use the word "certify" and does not state that "signing off" includes a certification that an officer read and understood the policy at issue.  The Sheriff's evidence showed that prior to the pursuit in this case the Sheriff's peace officers were required to acknowledge that they "received, read, and understood" the Policy by entering their username and password.  That constitutes the certification required by section 17004.7, subdivision (b)(2).  Riley points to nothing in the statute stating that the certification requirement must be spelled out; the statute only specifies that certification must *actually be required*.

Riley also argues the Sheriff's electronic sign off procedure does not constitute certification "in writing" within the meaning of section 17004.7, subdivision (b)(2).  Riley points to nothing in the statute that supports his contention, nor authority from other contexts defining the meaning of a "writing."  As the Sheriff points out, Evidence Code section 250 provides that " 'Writing' means handwriting, typewriting, printing,

_____

[9] Riley asserts in passing that the Sheriff's document showing which officers completed the electronic certification is inadmissible hearsay.  He also asserts in passing that the 2017 screenshot of the electronic certification page was inadmissible.  However, those contentions have been forfeited, because Riley failed to provide reasoned argument with citations to authority why the trial court abused its discretion in considering the documents.  (*Badie v. Bank of America*, *supra*, 67 Cal.App.4th at pp. 784–785.)

12

photostating, photographing, photocopying, transmitting by electronic mail or facsimile, and every other means of recording upon any tangible thing, any form of communication or representation, including letters, words, pictures, sounds, or symbols, or combinations thereof, and any record thereby created, regardless of the manner in which the record has been stored." If the Legislature intended "writing" to refer only to handwriting on paper, it would have so required.

In support of Riley's assertion that an electronic certification is not "in writing," Riley points to an attestation form prepared by the POST Commission, which the Legislature entrusted to establish vehicle pursuit training guidelines. (*Ramirez*, *supra*, 5 Cal.5th at p. 1002; Pen. Code, § 13519.8.) As described by the court of appeal in *Morgan*, *supra*, 246 Cal.App.4th at page 159, the Commission's FAQs state, " '[p]eace officers must also sign an attestation form (doc) that states they have "received, read, and understand" the agency pursuit policy. The agency must retain this form.' " (See also <<https://post.ca.gov/Vehicle-Pursuit-Guidelines-FAQs>> (as of Dec. 12, 2019).) The POST Commission's attestation form is one way to comply with the requirement of certification in writing. However, the Commission cannot create a paper certification requirement not present in the statute. We reject Riley's contention that section 17004.7, subdivision (b)(2) requires a certification on paper.[10]

Finally, Riley argues the Policy was not promulgated within the meaning of section 17004.7, subdivision (b)(2) because the Sheriff's evidence shows approximately 20% of officers failed to complete the electronic certification. *Ramirez*, *supra*, 5 Cal.5th 995, addressed a related issue. There, the question was "whether a public agency may receive section 17004.7's immunity only if every peace officer it employs has, in fact, provided the written certification." (*Ramirez*, at p. 997.) The court held "that the agency's policy must require the written certification, but 100 percent compliance with

---

[10] Riley is also misplaced in relying on another portion of the bill that enacted the promulgation requirement, which authorized the California Highway Patrol to "develop and approve a paper or electronic form" regarding vehicle pursuit data. (Stats. 2005, ch. 485, § 9, p. 3823; § 14602.1, subd. (a).) Both paper and electronic forms are "in writing."

13

that requirement is not a prerequisite to receiving the immunity." (*Ibid.*) The court reasoned that the plain meaning of the statutory language "is that the policy must contain the requirement, not that every peace officer must meet the requirement." (*Id.* at pp. 1000–1001.) The court left open the question of "when a lack of compliance with the certification requirement or meaningful implementation of the pursuit policy indicates that an agency is not satisfying the statute's requirements." (*Id.* at p. 1002.)

We note that both parties misunderstand the state of the record in *Ramirez*, *supra*, 5 Cal.5th 995. In that case, the defendant was only able to produce written certifications from 64 of the 92 officers, but the custodian of records testified that " 'all City officers employed at the time of the incident completed such forms, but some forms might have been lost during the police department's move to a new station.' " (*Ramirez*, *supra*, 5 Cal.5th at p. 998.) The court of appeal granted summary judgment on the basis that an agency does not need to prove total compliance with the certification requirement for immunity under section 17004.7, and the Supreme Court affirmed. (*Ramirez*, at p. 998.) On appeal, Riley asserts *all* officers in *Ramirez* complied with the certification requirement. However, that was a disputed issue of fact in the case; otherwise, the Supreme Court would have had no occasion to consider whether the failure to obtain 100% compliance led to loss of immunity. On the other hand, the trial court below and the Sheriff on appeal assert that in *Ramirez* there was an even worse compliance rate than the 20% in the present case because about 30% of written certifications were missing; but in *Ramirez* there was also testimony that *all* officers had signed certifications but some of the copies had been lost in a move. Accordingly, it appears the *Ramirez* decision was premised on an assumption that one or more of the officers, but substantially fewer than 30%, failed to complete the certification required by section 17004.7.

In the present case, we conclude Riley has not shown there is a triable issue of material fact on this aspect of the promulgation issue. Riley emphasizes a passage in *Ramirez* in which the court pointed out the absurdity of interpreting section 17004.7 to require 100% compliance. (*Ramirez*, *supra*, 5 Cal.5th at p. 1001.) The Supreme Court quoted the court of appeal in observing, "Plaintiff's interpretation would impose a heavy

14

burden on public agencies, especially large ones. '[R]equiring 100 percent compliance as a condition of immunity could potentially result in the absurd circumstance that the failure of a single officer to complete a written certification in an agency employing thousands could undermine the agency's ability to claim immunity, even though the agency conscientiously implemented its pursuit policy.' " (*Ibid.*)[11] However, there is no basis to conclude that the Supreme Court in quoting that passage meant to suggest that promulgation under section 17004.7 requires a showing that all but one or two officers certified they received, read, and understood the pursuit policy. To the contrary, the Supreme Court expressly left that question open as "outside the scope of the issue presented for our review." (*Ramirez*, at p. 1002.)

The Sheriff presented evidence showing it "conscientiously implemented its pursuit policies" (*Ramirez*, *supra*, 5 Cal.5th at p. 1001), and made an extensive effort to disseminate the Policy and obtain responses from officers. All officers were notified of the Policy by the DMS, and General Order 2.01 required the officers to certify they read and understood the Policy. Additionally, General Order 2.01 required commanding officers to ensure compliance with the electronic certification requirement, and the order required the Regional Training Center to notify the commanding officers about non-compliance. Further, the Sheriff submitted a declaration from the employee responsible for the DMS averring that, "The general practice throughout the units is that the unit commander or the designee of the unit commander would either request an audit of the DMS for the unit, or perform the audit him or herself to determine if officers had any items in their DMS inbox [that] needed to be signed off on. Unit commanders would discuss sign offs during shift briefing known as 'muster.' They would instruct officers to review and sign off on unsigned items."

_____

[11] Riley points to the POST Commission's page of "Frequently Asked Questions" regarding the Guidelines where the Commission states that "the law . . . requires all peace officers to receive the training annually in order to qualify for immunity." (See <<https://post.ca.gov/Vehicle-Pursuit-Guidelines-FAQs>> (as of Dec. 12, 2019).) To the extent that can be construed as requiring a law enforcement agency to show 100% compliance to obtain immunity, it is contrary to *Ramirez*, *supra*, 5 Cal.5th at p. 997.

We agree with the trial court's conclusion the Sheriff made a "prima facie" showing it has "a system in place that is reasonably designed to apprise all peace officers of the" Policy. The Sheriff presented evidence that compliance with the certification requirement was required of all officers, and that unit commanders followed up with officers who had not complied. Riley did not respond to that showing with evidence that such follow-up did not occur. Further, Riley points to nothing in the record showing the Sheriff in any way concealed the Policy, suggested it was unimportant, indicated certification was optional, or otherwise undermined compliance with the certification requirement. Although the Sheriff's failure to obtain certifications from approximately 20% of the officers suggests there are ways the Sheriff can improve its follow-up process, there is no basis in the record to conclude that there was such a failure to implement the policy that its adoption was "a mere formality." (See *Ramirez*, *supra*, 5 Cal.5th at p. 1000 [characterizing promulgation obligation in section 17004.7 as "requirements that the public entity implement the policy through training and other means to ensure it is not a mere formality"].)[12]

The trial court properly concluded there is no triable issue of material fact as to Riley's claim the Sheriff failed to promulgate the Policy within the meaning of section 17004.7, subdivision (b)(2).

B. *Section 17004.7, Subdivision (c) Requirements*

"In order for the immunity to apply under section 17004.7, a public entity must adopt a pursuit policy that clearly and with specificity sets forth standards to guide

---

[12] The approximately 80% compliance with the certification requirement, combined with the evidence of the Sheriff's extensive efforts to obtain compliance and the absence of evidence to the contrary, is sufficient to show promulgation. Therefore, we need not and do not address the Sheriff's contention that "after the Supreme Court's decision in *Ramirez*, all that is required in order to demonstrate the 'promulgation' component of section 17004.7 is evidence that the agency's policy required its officers to provide written certification of the pursuit policy." Further, we need not address whether a higher rate of noncompliance with an agency's certification requirement than occurred here would show lack of promulgation, despite that agency's extensive efforts to obtain compliance.

officers in the field. [Citation.] A pursuit policy must do more than simply advise pursuing officers to exercise their discretion and use their best judgment in initiating, conducting, and terminating a pursuit. [Citation.] Whether a pursuit policy is sufficient under the statute is a question of law for the trial court, subject to independent review on appeal." (*Alcala v. City of Corcoran* (2007) 147 Cal.App.4th 666, 674–675.) In the present case, Riley argues the Policy fails to satisfy two of the "minimum standards" in section 17004.7, subdivision (c), relating to determination of speed and air support. We reject the claim.

          1.     *Speed*

As noted previously, minimum standard number seven directs that pursuit policies should "[d]etermine the factors to be considered by a peace officer and supervisor in determining speeds throughout a pursuit. Evaluation shall take into consideration public safety, peace officer safety, and safety of the occupants in a fleeing vehicle." (§ 17004.7, subd. (c)(7).)

As Riley points out, there is no portion of the Policy that expressly states "factors to be considered . . . in determining speeds throughout a pursuit." (§ 17004.7, subd. (c)(7).)[13] Instead, the most relevant portion of the Policy is entitled "GUIDELINES FOR INITIATING, CONTINUING OR TERMINATING PURSUITS." It lists 17 "factors [that] should be considered to determine whether a pursuit should be initiated, continued, or terminated." The factors include, "[t]he seriousness of the originating incident or violation, and the relationship to community safety;" "[s]afety of the public in the area of the pursuit;" "[s]afety of the pursuing deputies;" "[v]olume of vehicular traffic;" "[v]olume of pedestrian traffic;" "[s]peeds involved;" "[t]ime of day;" "[w]eather conditions;" "[r]oad conditions;" "[t]ype of area, e.g., rural, urban, suburban, schools, business, residential, etc;" "[f]amiliarity of the deputy and supervisors with the area of

---

[13] Riley cites to deposition testimony from witnesses for the Sheriff in which they admit the Policy does not articulate factors an officer should use in determining speed during a pursuit. That testimony appears to reflect the lack of express language to that effect in the Policy, but the determination of compliance with section 17004.7 is a question of law for the courts based on the Policy itself. (§ 17004.7, subd. (f).)

17

the pursuit;" "[q]uality of radio communications;" "[t]he capability of the patrol vehicle;" "[t]he capability of the deputy driving the patrol vehicle;" "[l]ength of the pursuit;" "[p]resence of a hostage in the vehicle being pursued;" and suspect identification such that "later apprehension can be accomplished."

The trial court concluded that, "[a]lthough the [Policy] does not include a section specifically regarding speed, a fair reading of the [P]olicy shows that it directs officers to consider appropriate factors, including speed, when making a decision to initiate, continue, or terminate a pursuit. A Pursuit Policy does not need to set a maximum limit on pursuit speed in order to be valid . . . . The Court fails to see a material difference between (1) directing officers to consider speed among the safety factors . . . when determining whether to continue a pursuit and (2) directing officers to consider other safety factors as part of a decision regarding the speed [with] which to continue or discontinue pursuit. Both ways of structuring a pursuit policy channel the officer's discretion by directing him to consider the 16 other factors in making decisions regarding speed and pursuit."

We agree with the trial court. A deputy could not fail to understand that the factors listed in the Policy for determining when to initiate, continue, or terminate pursuits should also be used to determine the manner in which they conduct the pursuit, including their speed. In particular, when a deputy is determining whether to initiate, continue, or terminate a pursuit, the most critical question is whether it is safe to achieve or maintain the speed necessary for pursuit. Accordingly, by listing the factors relevant to determining whether to initiate, continue, or terminate a pursuit, the Policy is in effect directing deputies to consider those same factors in determining speed.

We find instructive on this point the POST Commission Guidelines, adopted pursuant to Penal Code section 13519.8. In *Ramirez v. City of Gardenia* (2017) 14 Cal.App.5th 811, at page 815, footnote 3, the Court of Appeal observed that "the requirements of section 17004.7, subdivision (c) are modeled" on the Guidelines. The court based that statement on section 17004.7, subdivision (e), which states that "[t]he requirements in subdivision (c) are consistent" with the Guidelines. Unlike the Policy,

18

the Guidelines do expressly list factors to consider in determining speed of pursuit. (Guidelines, at pp. 1-13 to 1-14.)  The Guidelines list 19 such factors, which are the *exact same factors* listed in the Guidelines to be considered in initiating, continuing, or terminating pursuit.[14]  (Guidelines, at p. 1-2.)  Furthermore, the 17 factors listed in the Policy with respect to initiating, continuing, or terminating pursuit heavily overlap with the 19 factors in the Guidelines for determining both speed and for determining whether to initiate, continue, or terminate pursuit.  The Policy uses different language, but the listed factors encompass 15 of the 19 factors listed in the Guidelines.[15]  When viewed in light of the Guidelines, it is clear that the Policy's only failing is the omission of the two words "speed and" in the sentence "The following factors should be considered to determine [speed and] whether a pursuit should be initiated, continued, or terminated."

We conclude the Policy does effectively "control and channel the pursuing officer's discretion" in determining the speed of pursuit.  (*Payne*, *supra*, 12 Cal.App.4th at p. 1747; see also *Ramirez v. City of Gardena*, *supra*, 14 Cal.App.5th at pp. 826–827 ["courts have found public agencies' policies sufficient under section 17004.7 when they provide guidance to officers concerning factors to consider, even if they also leave room for the exercise of individual discretion in particular cases"]; *McGee*, *supra*, 56

---

[14] The Guidelines expressly acknowledge the factors are identical, stating, "Factors which may be considered by the officer(s) and supervisor(s) to determine reasonable speeds, in view of the circumstances and environment of each pursuit, may be referenced in Guideline 1: When to Initiate a Pursuit, and Guideline 8: Continuation or Termination of a Pursuit."  (Guidelines, at p. 1-13.)

[15] The 15 Guidelines factors that *are* included in the Policy factors include: "Public safety," "Nature of offense and apparent circumstances," "Officer safety," "Pedestrian and vehicular traffic patterns and volume," "Other persons in or on pursued vehicle," "Location of the pursuit," "Time of day," "Speed of fleeing suspect," "Weather and visibility," "Road conditions," "Identity of offender (if known)/offender can be located at a later time," "Capabilities of law enforcement vehicle(s)," "Ability of officer(s) driving," "Officer's/supervisor's familiarity with the area of the pursuit," and "Quality of radio communications."  (Guidelines, at pp. 1-13 to 1-14.)  The only four Guidelines factors not among those listed in the Policy are "Vehicle Code requirements," "Passenger in officer's vehicle," "Availability of additional resources," and "Whether supervisory approval is required."  (*Ibid*.)

19

Cal.App.4th at p. 543 [noting prior decisions concluded pursuit policies were deficient where they allowed for " ' "what is effectively unbridled officer discretion" ' "]; *Payne*, at p. 1747 ["A policy which merely memorializes the unfettered discretion to initiate or terminate a pursuit or which allows each officer to use his or her own subjective standards for determining when a pursuit should be initiated, continued or terminated fails to provide any entity control."].) To deny the Sheriff immunity under section 17004.7 due to the Policy's failure to expressly state the listed factors that should be considered in determining speed would elevate form over substance, without furthering the Legislature's goal of encouraging fewer and safer pursuits.

### 2. *Air Support*

Section 17004.7, subdivision (c)(8) requires pursuit policies to "Determine the role of air support, where available. Air support shall include coordinating the activities of resources on the ground, reporting on the progress of a pursuit, and providing peace officers and supervisors with information to evaluate whether or not to continue the pursuit." Riley contends the Policy "fail[s] on its face" to satisfy that requirement. The claim requires little discussion. As detailed previously, the Policy states that air support "may be utilized to support ground operations during a vehicle pursuit" and specifies, among other things, the information to be provided by air support and how the information should be used by the Sheriff's units on the ground. Riley asserts that the Policy gives "unfettered discretion" to officers in determining whether to request air support. However, elsewhere the Policy specifies that Emergency Services Dispatch "will determine if air support is available."

Riley suggests the Policy is inadequate because it does not address each of the "Factors to Consider" in determining the role of air support listed in the POST Guidelines, including "Illumination (use of spotlight)," "Surveillance tactics," "Weather," "Number of air units," and "Aircraft Safety." (Guidelines, at p. 1-6.) In fact, the Policy addresses some of those matters. For example, the Policy covers surveillance tactics and weather by specifying five categories of information that the aircraft flight crew can relay to ground personnel, including information about the pursued vehicle, road conditions,

20

weather, and other hazards. The Policy states that "[t]he monitoring Sergeant and Watch Commander will closely monitor the supporting aircraft communications to assist in deciding whether or not to continue the pursuit." The circumstance that the Policy does not address illumination, the number of air units, and aircraft safety is not determinative because the Guidelines are clear that they are only "a resource for each executive to use in the creation of a specific policy the agency will adopt that reflects the needs of the agency, the jurisdiction it serves, and contemporary law." (Guidelines, at p. vii.) Viewed as a whole, the Policy is actually substantially *more* detailed than the Guidelines on the topic of air support, and the Policy plainly complies with the language of section 17004.7, subdivision (c)(8).

      C.     *The Sheriff Has Shown Compliance with the Training Requirement*

Section 17004.7, subdivision (b) mandates that agencies provide "regular and periodic training on an annual basis" regarding pursuit policies, and section 17004.7, subdivision (d) specifies that such training "shall include, at a minimum, coverage of each of the subjects and elements set forth in subdivision (c) and that shall comply, at a minimum, with the training guidelines established pursuant to Section 13519.8 of the Penal Code." Penal Code section 13519.8, subdivision (b) provides that "[t]he course or courses of basic training for law enforcement officers and the guidelines shall include adequate consideration of each of" 15 subjects, including "speed limits." On appeal, Riley contends the Sheriff's training failed to include consideration of speed limits.

The evidence regarding the Sheriff's training was introduced pursuant to a declaration from Kerri Hansen, a deputy sheriff who was responsible for developing the Sheriff's "curriculum for driver training," including the training to comply with section 17004.7. She explained in her declaration that the section 17004.7 training was provided in a training video that is updated annually. She averred, "These training videos cover each of the subjects and elements set forth in [section 17004.7, subdivision (c)] and comply with the training guidelines pursuant to Penal Code section 13519.8." A copy of the 2014 training video was attached to Hansen's declaration.

This court has viewed the 2014 training video. The instructional portion of the video lasts 25 minutes. The video does not use the phrase "speed limits" or discuss any specific numerical speeds that should not be exceeded in any particular circumstances. Instead, like the Policy itself (see Part IV(B)(1), *ante*), the video lists the factors that should be considered in deciding whether to initiate, continue, or terminate a pursuit, including "speeds traveled." Like the Policy, we interpret that portion of the training video as providing guidance to deputies in determining speed, because those factors effectively aid deputies in determining whether it is safe and appropriate to drive fast enough to maintain pursuit. Additionally, later in the video on-screen text cautions "SLOW DOWN!" and "CHECK YOUR SPEED," while the narrator describes law enforcement fatalities resulting from "single vehicle collisions"—the narrator observes that accidents can happen in any conditions and states "we're driving too fast for the conditions." Finally, at one point a trainer makes a passing reference to "monitoring our speed for the current conditions." After the 25 minutes of instruction, there are two "case studies," consisting of recordings of exchanges between Sheriff's dispatchers and deputies during actual past pursuits. After each case study, on-screen text directs that the playback be paused for a 10 minute debrief regarding the pursuit, but the record contains no information about what matters were covered during those discussions.[16]

---

[16] The only document in the record related to the Sheriff's pursuit training that references "speed limits" is a September 17, 2014, "Training Bulletin." The bulletin is entitled "ANNUAL HIGH SPEED VEHICLE PURSUIT TRAINING Penal Code 13519.8." The bulletin references the Sheriff's training video and explains that part of the video may be viewed by deputies on their own and that there is a "Case Studies" portion that "should be viewed as a group" with "facilitated discussion held by a supervisor to ensure that all staff understands the [Sheriff's] written directives related to pursuits . . . . The facilitated portion of the training provides an opportunity for staff to ask questions and seek clarification." The facilitated discussion should last "approximately 30 minutes." The bulletin continues, "Supervisors facilitating the Pursuit Update training video portion should ensure students have an understanding of" 21 listed topics and sub-topics. "Speed limits" is listed as a sub-topic under the topic "Consideration of law enforcement vehicle pursuit issues." But the record contains no evidence from supervisors regarding any steps taken to ensure students understood the listed topics.

Our determination of the legal adequacy of the Sheriff's training video turns on our construction of the phrase "speed limits" in Penal Code section 13519.8, subdivision (b). Appellant effectively argues "speed limits" requires the training to specify numeric or relative limitations on speed, even though that is beyond what is required by section 17004.7, subdivision (c)(7). As we concluded previously (Part IV(B)(1), *ante*), the Sheriff's Policy *does* comply with that minimum standard requirement. Because the content of the training video is essentially equivalent to the content of the Policy, the video itself is also adequate, unless "speed limits" requires that the training cover a matter that the Policy itself need not address.

We must construe the reference to "speed limits" in Penal Code section 13519.8, subdivision (b), in harmony with the remainder of the Penal Code provision as well as with section 17004.7. (See *Alameda Produce*, *supra*, 52 Cal.4th at p. 1107 ["We must harmonize the statute's various parts by considering it in the context of the statutory framework as a whole."].) At the outset, we note that the Penal Code provision does not suggest there are substantive differences between the scope of the training and the policy guidelines. Penal Code section 13519.8, subdivision (a), provides that the POST Commission "shall implement a course or courses of instruction for the regular and periodic training of law enforcement officers in the handling of high-speed vehicle pursuits and shall also develop uniform, minimum guidelines for adoption and promulgation by California law enforcement agencies for response to high-speed vehicle pursuits. The guidelines and course of instruction shall stress the importance of vehicle safety and protecting the public at all times, include a regular assessment of law enforcement's vehicle pursuit policies, practices, and training, and recognize the need to balance the known offense and the need for immediate capture against the risks to officers and other citizens of a high-speed pursuit." Even more to the point, Penal Code section 13519.8, subdivision (b), states that "The course or courses of basic training for law enforcement officers *and* the guidelines shall include adequate consideration of each of the following subjects . . . ." (Italics added.) Thus, the Penal Code provision at issue suggests that the policy guidelines and training must address the same subjects.

23

Section 17004.7 is consistent. Section 17004.7, subdivision (d) references *both* the minimum standards and the Penal Code section 13519.8 training requirements in defining " 'Regular and periodic training' " to mean "annual training that shall include, at a minimum, coverage of each of the subjects and elements set forth in subdivision (c) and that shall comply, at a minimum, with the training guidelines established pursuant to Section 13519.8 of the Penal Code." The list of subjects in Penal Code section 13519.8, subdivision (b), essentially covers the minimum standards listed in section 17004.7, subdivision (c), albeit with some different language and ordering. That is, it appears that all of the issues that must be given "adequate consideration" in trainings (Pen. Code, § 13519.8, subd. (b)) are encompassed by the "minimum standards" listed in section 17004.7, subdivision (c). That makes sense: it is logical that trainings would cover the topics in the policies and vice versa. To accept appellant's interpretation of "speed limits" would require this court to conclude that the Legislature intended trainings to impose specific numeric or relative limitations on speed, even though policies are not required to contain such limitations to comply with section 17004.7. We can think of no reason the Legislature would have decided *not* to require policies to address a matter that trainings are mandated to address, particularly in light of the absence of any indication in the statutory scheme that the policies and trainings were intended to cover different topics.

The section 17004.7 legislative history is consistent with this understanding of the statutory scheme. Section 17004.7 was amended by Senate Bill 719 in 2005 to impose more detailed minimum policy standards, including that related to determination of speed. (Stats. 2005, ch. 485, § 11, at pp. 3825–3827.) The legislative history does not explain the use of "speed" versus "speed limits," but it does appear the Legislature understood the policy and training requirements to be co-extensive. For example, a Senate Committee on Public Safety analysis stated, "This bill provides that each law enforcement agency shall adopt, promulgate, and require regular and periodic training consistent with an agency's specific pursuit policy that at a minimum, complies with the guidelines created by POST." (Sen. Comm. on Pub. Safety, Analysis of Sen. Bill 719

24

(2005–2006 Reg. Sess.), as amended April 21, 2005, at p. D.) Later, the bill analysis states, "This bill provides that an agency will only get immunity if they not only adopt a policy but also promulgate it and provide regular and periodic training on the policy." (*Id.* at p. J; see also Sen. Comm. on Appropriations, Analysis of Sen. Bill 719, as amended May 19, 2005 at p. 4.) Thus, the required training is to be *regarding the pursuit policy*, rather than on additional matters not covered in the policy.

The legislative history is also clear the 2005 amendments were motivated in part by the concern expressed in *Nguyen*, *supra*, 103 Cal.App.4th at page 1168, that the then current version of section 17004.7 "simply grants a 'get out of liability free card' to public entities that go through the formality of adopting [a pursuit] policy. There is no requirement the public entity implement the policy through training or other means." (See Sen. Comm. on Judiciary, Analysis of Sen. Bill 719 (2005–2006 Reg. Sess.), as amended May 5, 2005, at p. 7 [discussing *Nguyen*]; Sen. Comm. on Pub. Safety, Analysis of Sen. Bill 719 (2005–2006 Reg. Sess.), as amended May 19, 2005, at p. K [same].) Viewed in light of *Nguyen*, the training requirement is intended to implement an agency's pursuit policy, not to require training on subjects beyond the scope of the policy. In sum, the statutory language and legislative history do not support construing "speed limits" in Penal Code section 13519.8, subdivision (b) to require training on matters not required to be included in the pursuit policy under the section 17004.7, subdivision (c), minimum standards.[17]

---

[17] The phrase "speed limits" was included in Penal Code section 13519.8 upon its enactment in 1993. (Stats. 1993, ch. 340, §1.) Nothing in the legislative history to the enactment defines the phrase, although it is interesting to observe that as introduced the bill required training on "[a]bsolute speed limits." (Sen. Bill 601 (1993–1994 Reg. Sess.) as introduced Mar. 2, 1993.) It is not clear whether the Legislature omitted the word "absolute" in the final enactment because its meaning was unclear or because the Legislature did not intend to require law enforcement agencies to impose any "absolute" restrictions on speed. The former view of the legislative history is consistent with our construction of "speed limits," and the latter view strongly supports our construction of the phrase.

Moreover, it is reasonable to construe "speed limits" as used in Penal Code section 13519.8, subdivision (b), to require guidance about determination of speed but not the specification of numeric or relative limits. Section 22350, which is the generally applicable basic speed law, provides, "No person shall drive a vehicle upon a highway at a speed greater than is reasonable or prudent having due regard for weather, visibility, the traffic on, and the surface and width of, the highway, and in no event at a speed which endangers the safety of persons or property." Section 22350 is effectively a speed limit provision, requiring drivers not to exceed speeds that are safe for road and traffic conditions. Similarly, the Sheriff's training—by exhorting deputies to slow down and by listing factors to consider in initiating, continuing, and terminating pursuit—effectively provides deputies guidance in determining when speed of pursuit is excessive due to the road and other conditions.

Appellant points out that Deputy Hansen testified in her deposition that the training did not cover the subject of speed limits. Specifically, Riley's counsel asked her, "In the 12 months prior to 10-29-2014, did the [Sheriff's] training consider or instruct on any limits on speed, either initially or, for that matter, throughout a pursuit?" Hansen responded, "No, sir." Shortly thereafter, Riley's counsel asked her a second time, "did the training in the . . . 12 or 24 months prior to the October 29th, 2014 incident -- address in any way the issue of speed limits?" Again, Hansen responded, "No, sir." It appears that in that exchange Deputy Hansen understood "speed limits" to require a specific numeric limitation on speed, but we have concluded to the contrary as a matter of statutory interpretation.

In conclusion, because the Sheriff showed that deputies were trained in accordance with the Policy, the Sheriff showed that the training included adequate consideration of speed limits as required by Penal Code section 13519.8, subdivision (b).[18] The trial court

[18] Riley also argues the Sheriff's Policy fails to require its officers to receive annual training. However, the Sheriff presented evidence it issued annual training bulletins notifying officers they were required to undergo annual pursuit training. Riley also alleges the Sheriff failed to use an attestation form to document completion of training,

did not err in granting the Sheriff's motion for summary judgment/adjudication on the basis of immunity under section 17004.7.[19]

V.    *Riley's Requests for Judicial Notice Are Denied*

On April 9, 2019, at the time of filing his opening brief, Riley requested that this court take judicial notice of pursuit policies adopted by 24 other California law enforcement agencies, to compare the language of those policies to the Sheriff's Policy. Riley also asked this court to take judicial notice of California Highway Patrol vehicle pursuit statistics he alleges show the Sheriff has reported a much higher number of pursuits than other agencies.

We deny Riley's requests for judicial notice as "unnecessary to resolution of the issues on appeal." (*Animal Legal Defense Fund v. LT Napa Partners LLC* (2015) 234 Cal.App.4th 1270, 1276, fn. 5.)  As explained above, the Sheriff's Policy and training comply with section 17004.7 as a matter of law (as to the aspects challenged by Riley on appeal).  The alleged circumstance that other jurisdictions have pursuit policies that are more detailed than the Sheriff's Policy, or more restrictive in authorizing high speed pursuits, would not show the Policy and training fail to comply with section 17004.7. Similarly, the alleged circumstance that Sheriff's deputies engage in many more pursuits would not show that the Policy and training fail to comply with section 17004.7.  If section 17004.7 is insufficiently prescriptive to achieve its statutory ends, that is a matter for the Legislature to consider.

## DISPOSITION

The trial court's judgment is affirmed.  Costs on appeal are awarded to respondent.

---

but he cites no authority use of such a form is required for immunity under section 17004.7.

[19] Because we affirm on the basis of section 17004.7 immunity, we need not address the Sheriff's argument in the alternative that it did not owe a legal duty of care to Riley, where a third-party was the direct cause of Riley's injuries.

_____

SIMONS, J.

We concur.

_____

JONES, P.J.

_____

BURNS, J.

(A156407)

Superior Court of Alameda County, No. RG15791353, Hon. Ioana Petrou, Judge.

Timothy P. Rumberger and Law Offices of Timothy P. Rumberger, for Plaintiff and Appellant.

Haapala, Thompson & Abern, Rebecca S. Widen, Jody Struck, and Christopher M. Wolcott, for Defendant and Respondent.